## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 24 2019, 8:36 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Karen Celestino-Horseman
Of Counsel, Austin & Jones, P.C.
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert A. Rowlett
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Tommie R. Shelton,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | June 24, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2802<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Lisa F. Borges, Judge<br><br>Trial Court Cause No.<br>49G04-1701-F5-1203 |

**Brown, Judge.**

[1] Tommie R. Shelton appeals the revocation of his placement in community corrections. We affirm.

## *Facts and Procedural History*

[2] On January 10, 2017, Shelton was charged with Count 1, battery resulting in bodily injury to a person less than fourteen years of age as a level 5 felony; Count 2, domestic battery as a level 6 felony; and Count 3, battery resulting in bodily injury as a class A misdemeanor. A jury found him guilty of Counts 1 and 2, and the court sentenced him to six years with one year suspended for Count 1 and to two years for Count 2 to be served concurrently. On March 1, 2018, the Community Transition Program ("CTP") filed a Screening Memo recommending that he be placed into CTP and "initially . . . into the Work Release component and moved to other components at the direction of Community Corrections staff."[1] Appellant's Appendix Volume II at 79. On July 6, 2018, Marion County Community Corrections ("MCCC") filed a Notice of Community Corrections Violation indicating that Shelton: "1. on 7/6/2018, failed to comply with the rules and regulations" of MCCC, and "2. failed to comply with [his] monetary obligation." *Id.* at 101. The notice further stated he was refusing to sign a medical release of information so that staff at Duvall Residential Center ("DRC") could effectively communicate with outside

---

[1] In its sentencing order, the court initially ordered that he serve the first two years of the executed sentence for Count 1 in the Indiana Department of Correction followed by three years in Marion County Community Corrections "in a component deemed appropriate with movement as deemed appropriate by the agency." Appellant's Appendix Volume II at 49.

medical providers on his behalf, that physicians were prescribing medications and he was not taking them as prescribed, and that, "[a]t this time, [he] is refusing medical assistance and employment." *Id.* On July 11, 2018, a Notice of Probation Violation was filed. On August 3, 2018, an Agreed Entry on MCCC Violation/Probation Violation was filed which indicated that Shelton agreed with the allegations "on CCV 1 & 2, VOP 1," that "Community Corrections placement continued with component: deemed appropriate by Community Corrections or as follows: work release w/ medical release, strict compliance," and "Continued on Probation for upon [sic] completion of executed sentence with added conditions: strict compliance." *Id.* at 116.

[3] On September 28, 2018, MCCC filed a second Notice of Community Corrections Violation indicating that Shelton: "1. failed to comply with [DRC] rules and regulations regarding refusing employment and/or the opportunity to seek employment" and "2. failed to comply with DRC rules and regulations regarding refusing a mandatory program." *Id.* at 129. On October 3, 2018, a second Notice of Probation Violation was filed and, on October 26, 2018, the court held a hearing on the alleged violations. Shelton's counsel indicated that Shelton was able to make an admission with explanation to the second allegation but was unable to make an admission to its first allegation. Patricia Montgomery, a DRC Employment Specialist, testified that employment is required for residents and answered in the negative when asked "outside of medical issues, is there any reason why anyone staying at [DRC] would not be required to work." Transcript Volume II at 7. In describing efforts to obtain

employment for Shelton, she testified regarding three interviews that she had sent him on in August and September 2018, stated that she received a call from an employer "before . . . the interview was even completed" and was told that Shelton had "pulled a recliner off their floor and said that he could not stand," and indicated that he had told another employer that he was not able to work and that he could not stand. *Id.* at 8. She indicated that she met with him after the second of the three interviews and told him that he was going to need to find employment and that Shelton informed her "that not only was he not working anywhere in America, he was gonna sit on his bunk" and "collect disability," "was not going to help clean," "was not going to do anything," and "was not gonna attend any" DRC classes. *Id.* at 9.

[4] Shannon Bowling, a DRC manager, testified that she had contact with doctors who treated him and that, at some point, Dr. Sharma "out of IU Ambulatory" was speaking with Nurse Trina Cornett, she was asked to participate in the phone call, and Dr. Sharma was placed on speakerphone

> where he informed us that there is no medical reason that
> [Shelton] is unable to work. There may be stipulations, but those
> would not be able to be confirmed because [Shelton] was not
> taking his required medication that he should be taking so they
> could tell what degree anything was affecting him. So he was not
> in compliance with his medical treatment.

*Id.* at 15. When asked if, "at that point in time, . . . the doctor ha[d] any restrictions for [Shelton] as far as work" she answered in the negative, and in response to being asked if "the doctor had cleared him to do any and all work,"

she stated "[a]bsolutely." *Id.* She indicated that she had many one-on-one conversations with Shelton explaining that, unless there was documentation that he was disabled, he would need to go to work.

[5] Nurse Cornett testified that she had an LPN license for eighteen years; that DRC had not received a disability statement from Shelton; that he cannot provide anything stating he cannot work; and that she and Bowling were present "with Dr. Sharma [during] his visit." *Id.* at 20. She was asked if, at this point in time, any documentation had been received that would prevent him from working, and she stated, "Having a disability statement. When we spoke with Dr. Sharma on the phone, he did say [Bowling] had said reiterated to –." *Id.* at 21. Shelton's counsel then objected on a hearsay basis to what Dr. Sharma had said, the court overruled the objection, and Nurse Cornett testified "Dr. Sharma said – [Bowling] had said, you know, he'd be able to get a job whenever – any place in the community and he understood that." *Id.* After stating that Shelton "had lots of problems" with not obtaining medication for pain management, Nurse Cornett indicated she had brought a copy of his medication administration record, which was later admitted without objection and showed when medication prescribed by a physician was taken, and that how often he took the medication "varies month to month" with "no consistency." *Id.* at 21-22. When asked if that "create[d] a problem when you're not consistent with pain medication," she responded affirmatively and stated "it's hard for the doctor to do an evaluation based on the medication you're taking or not taking." *Id.* at 22. During cross-examination the court

asked Nurse Cornett "with all of these visits back and forth" if there "was ever a communication to you of a diagnosis made," and she responded in the negative. *Id.* at 26. Defendant's Exhibit B, a letter dated May 17, 2018, and signed by Ann D. Zerr, M.D., was admitted, and states that Shelton "is having significant pain and morning stiffness" and "is being evaluated for serious forms of arthritis" and that "[f]or the next two weeks he is only able to stand or walk for 15 minutes at a time." Exhibits Volume at 6.

[6] The court found Shelton "uncooperative with" DRC in "providing them with requested documents," that he "did not comply even after the Court had to intervene without pressure from the management" at DRC, and that he was disrespectful with staff. Transcript Volume II at 59. Finding him in violation, it ordered the "four years of backup time" be executed at the DOC. *Id.* at 60.

## *Discussion*

[7] Shelton first argues that the trial court abused its discretion and committed fundamental error in admitting certain hearsay statements. Generally, we review the trial court's ruling on the admission or exclusion of evidence for an abuse of discretion. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997), *reh'g denied*. We reverse only where the decision is clearly against the logic and effect of the facts and circumstances. *Joyner v. State*, 678 N.E.2d 386, 390 (Ind. 1997), *reh'g denied*. Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission constituted harmless error. *Fox v. State*, 717 N.E.2d 957, 966 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*. We further note that failure to object to the admission of evidence normally results in waiver and precludes appellate

review unless its admission constitutes fundamental error. *See Whatley v. State*, 908 N.E.2d 276, 280 (Ind. Ct. App. 2009) (citing *Cutter v. State*, 725 N.E.2d 401, 406 (Ind. 2000), *reh'g denied*), *trans. denied*. To rise to the level of fundamental error, an error "must constitute a blatant violation of basic principles, the harm or potential for harm must be substantial, and the resulting error must deny the defendant fundamental due process." *Id.* (citing *Maul v. State*, 731 N.E.2d 438, 440 (Ind. 2000) (citations omitted)).

[8] Shelton contends that the hearsay statements of Dr. Sharma were the centerpiece of the State's arguments "that [he] failed to take the pain medications so he could be evaluated and that he could work any job," which he asserts serve as the primary bases upon which the court found that he had violated MCCC rules. Appellant's Brief at 9. He argues he was denied due process as he was unable to cross-examine Dr. Sharma, contends that the admission of the testimony was not harmless under a federal harmless error analysis, and asserts that a failure to object at the hearing constitutes fundamental error. The State argues that no error occurred as the court did not rely on Dr. Sharma's second statement.

[9] For purposes of appellate review, we treat a hearing on a petition to revoke placement in a community corrections program the same as we do a hearing on a petition to revoke probation. *Cox v. State*, 706 N.E.2d 547, 549 (Ind. 1999), *reh'g denied*. Our standard of review of an appeal from the revocation of a community corrections placement mirrors that for revocation of probation. *Id.* at 551. The Due Process Clause applies to probation revocation hearings. *Reyes v. State*, 868 N.E.2d 438, 440 (Ind. 2007) (citing *Gagnon v. Scarpelli*, 411

U.S. 778, 782, 93 S. Ct. 1756 (1973)), *reh'g denied*. "But there is no right to probation: the trial court has discretion whether to grant it, under what conditions, and whether to revoke it if conditions are violated." *Id.* "It should not surprise, then, that probationers do not receive the same constitutional rights that defendants receive at trial." *Id.* The due process right applicable in probation revocation hearings allows for procedures that are more flexible than in a criminal prosecution. *Id.* Such flexibility allows courts to enforce lawful orders, address an offender's personal circumstances, and protect public safety, sometimes within limited time periods. *Id.* Within this framework, and to promote the aforementioned goals of a probation revocation hearing, courts may admit evidence during probation revocation hearings that would not be permitted in a full-blown criminal trial. *Id.* "This does not mean that hearsay evidence may be admitted willy-nilly in a probation revocation hearing." *Id.*

[10] In *Reyes*, the Indiana Supreme Court adopted the substantial trustworthiness test for determining the hearsay evidence that should be admitted at a probation revocation hearing. *Id.* at 441. This test requires that the trial court evaluate the reliability of the hearsay evidence. *Id.* at 442. In adopting it, the Court noted the "need for flexibility combined with the potentially onerous consequences of mandating a balancing inquiry for every piece of hearsay evidence in every probation revocation hearing" and stated that there was "no reason to require that the State expend its resources to demonstrate that its interest in not producing the declarant outweighs the probationer's interest in confronting the same . . . [or] to produce a witness . . . to give routine testimony

. . . when a reliable piece of hearsay evidence is available as a substitute." *Id.* at 441-442.

[11] We note that Shelton failed to object to the admission of Bowling's testimony when she first mentioned Dr. Sharma and described a conversation with him. To the extent that Shelton has not waived the issue, we also note that, while the preference is for the trial court to make a determination of substantial trustworthiness on the record, the failure to do so is not fatal where the record supports such a determination. *See id.* at 442 (affirming trial court's admission of affidavits in probation revocation despite the court's failure to provide detailed explanation on record, because evidence supported substantial trustworthiness of affidavits). Our review of the record reveals that Montgomery testified that employment was required for DRC residents and that no reason beyond medical issues would remove the requirement. Nurse Cornett indicated that Shelton could not provide anything which states he could not work. She additionally testified that she and Bowling were present with Dr. Sharma and that he had made a statement about what Bowling had said or reiterated. Bowling testified that she participated in a call with Dr. Sharma in which he stated that there was no medical reason Shelton could not work. She further indicated that the doctor did not have any work restrictions for Shelton and had cleared him to do any and all work, and she testified that she had conversations with Shelton and explained that he would need to go to work unless there was documentation that he could not. Based upon the record, and in light of the fact that both Bowling and Nurse Cornett testified at the

placement revocation hearing, we conclude that sufficient information was presented to deem the alleged hearsay statements substantially trustworthy.

[12] Further, when the court found that the State had met its burden of proving a violation, it noted that work release was not a good fit "[p]rimarily because of his attitude," which it found had "made it impossible to continue" at DRC. Transcript Volume II at 60. The hearsay statements of Dr. Sharma concerned a medical exception to the work requirement and not Shelton's attitude while at DRC. We cannot say the court abused its discretion or committed fundamental error in admitting the challenged testimony.

[13] Shelton next argues that the evidence is insufficient to revoke his placement in community corrections. He contends that the State's evidence centered on the alleged hearsay statements that he could not be evaluated because he was willfully not taking two medications, that the State's records indicated that one pain medication was prescribed to be taken only as needed and another was not prescribed until after the alleged conversation with Dr. Sharma, and that the evidence was insufficient to show that he willfully failed to take medication so as to prevent his functionality from being evaluated. The State argues that the court relied on sufficient evidence of Shelton's combative attitude and unwillingness to comply with the DRC residential and employment rules, and maintains that he had already violated probation once and had been placed on strict compliance.

[14] Placement in community corrections is at the sole discretion of the trial court. *Toomey v. State*, 887 N.E.2d 122, 124 (Ind. Ct. App. 2008) (citing Ind. Code § 35-38-2.6-3(a) (a court "may . . . order a person to be placed in a community corrections program as an alternative to commitment to the department of correction")). Like a probation hearing, a hearing on a petition to revoke placement is civil in nature and the State need prove the alleged violations by only a preponderance of the evidence. *See id.* at 551. We consider all the evidence most favorable to supporting the judgment of the trial court without reweighing that evidence or judging the credibility of witnesses. *Id.* If there is substantial evidence of probative value to support the trial court's conclusion, we will affirm its decision. *Id.* The evidence supports the court's findings that Shelton was uncooperative with DRC in providing requested documentation; that he was uncooperative after having previously refused to sign medical documentation and after the court's order which added the condition of strict compliance; and that he did not comply with the court's order without pressure from DRC management. Based upon the facts most favorable to the trial court's decision, we conclude the State proved the alleged violations by a preponderance of the evidence.

[15] For the foregoing reasons, we affirm the trial court's order revoking Shelton's community corrections placement.

[16] Affirmed.

May, J., and Mathias, J., concur.